915 F.2d 1566
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter Ellsworth JOHNSON, Defendant-Appellant.
 No. 89-5431.
 United States Court of Appeals, Fourth Circuit.
 Argued May 11, 1990.
Decided Oct. 12, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CR-89-46-JFM)
 Bryan David Bolton, Shapiro & Olander, Baltimore, Md., for appellant.
 Jan Paul Miller, Assistant United States Attorney, Baltimore, Md., (Argued), for appellee; Breckinridge L. Willcox, United States Attorney, John V. Geise, Assistant United States Attorney, Baltimore, Md., on brief.
 D.Md.
 AFFIRMED.
 Before WIDENER and PHILLIPS, Circuit Judges, and EDWARD S. SMITH, Senior Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.
 PER CURIAM:
 
 
 1
 Walter E. Johnson appeals his conviction for possession with intent to distribute and distributing heroin in violation of 21 U.S.C. Sec. 841(a)(1) and aiding and abetting and possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. We affirm.
 
 
 2
 In early January 1989, a telephone caller spoke to officers of the Prince George's County, Maryland, police department and informed them that she knew of a man who wished to sell large quantities of heroin. The informant arranged a meeting between undercover agents and the purported dealer, Emmanuel Onyido, who provided the agents with one gram of heroin as a sample. Onyido and the officers subsequently had several telephone conversations, and Onyido eventually agreed to sell the agents an ounce of heroin for $6,000.
 
 
 3
 On January 11, 1989, Onyido arrived at the location where the sale was to take place. Onyido was accompanied by Emilio Perez, who was in a separate car. The two undercover agents who were posing as buyers also were in separate cars, consistent with a common practice in the drug trade of separating drugs or money from a transaction for as long as possible so that a prospective buyer or seller will have less opportunity to abscond with both, or be robbed. Detective Paul Patterson asked Onyido if the heroin was there, and Onyido replied that it was, but that his friend in the second car had it. Patterson signaled the agent in the other car, Ray McCaslin, who drove over and supplied Patterson with the money. After Patterson gave Onyido the money, Onyido signaled Perez, notifying him that it was safe to release the heroin. Perez then gave the heroin to McCaslin.
 
 
 4
 A number of additional meetings between Onyido and the agents took place, during which Onyido expressed a willingness to sell even larger quantities of heroin. During one of the conversations, Onyido stated that, whenever he sold drugs, he always had someone with him. Onyido eventually agreed to sell the agents one-half of a kilogram of heroin. The transaction was to take place at 9:00 a.m. on January 30, and police officers established surveillance of Onyido's residence at approximately 4:30 a.m. that morning.
 
 
 5
 Shortly after 8:00 a.m., while tracking Onyido's car, the officers observed a second vehicle, operated by appellant Johnson, which appeared to be following Onyido. The two cars stopped together several times, and during some of the stops Johnson and Onyido appeared to converse, although the agents were too far away to hear what they were saying. At one point Johnson stood waiting in the rain while Onyido drove to another location and shortly returned. Onyido eventually stopped at a service station in College Park, where he telephoned agent Patterson and gave him directions to the location. Johnson positioned his car facing the station in a parking lot directly across the street.
 
 
 6
 After arriving at the station, agent Patterson entered Onyido's car and asked him where the heroin was located. Onyido replied, "It is here." The two had a short conversation, during which Patterson asked Onyido whether he had anyone else with him. Onyido stated, "You know I have somebody else with me." Onyido accompanied Patterson to Patterson's car to telephone McCaslin, who had the money, but then Onyido apparently became suspicious. After telling Patterson that he needed to make a phone call, Onyido instead got in his car and exited the station's parking lot. Almost immediately, Johnson pulled out from across the street and followed Onyido.
 
 
 7
 Police officers soon overtook and stopped the two vehicles, at which point both Onyido and Johnson were arrested. In the passenger compartment of Johnson's vehicle, the officers discovered a blue plastic bag containing 496.9 grams of 88.9 percent pure heroin. Special agent Jeffrey Favitta of the FBI testified that, after Johnson was placed in a police cruiser, Favitta advised Johnson of his constitutional rights. Officer John Stanton, who was driving the cruiser, confirmed Favitta's testimony. Although Johnson did make some statements during the trip from the scene of his arrest to the police station, the officers testified that Johnson did not indicate that he wished to speak with an attorney or that he did not want to speak to the officers any more. Favitta also testified that, after arriving at the police station, Johnson indicated that he fully understood his rights. Johnson then signed a form which waived his constitutional rights and thereafter made several incriminating statements. Again, the police officers involved testified that Johnson did not ask to speak to an attorney or express a desire that the questioning cease.
 
 
 8
 At the suppression hearing and at trial, Johnson presented rather a different version of his arrest and subsequent questioning. Johnson testified, and Stanton denied, that Officer Stanton began suggesting that he talk to the officers immediately after his arrest, and that Agent Favitta did not advise him of his rights. Johnson stated that he was not advised of his rights until after he arrived at the police station. In addition, Johnson testified that he requested an attorney both in the police car and at the station, but that the officers continued to question him. Johnson asserted that another officer who questioned him, Special Agent Kenneth Counts, told him that the charges would be reduced to a misdemeanor if he cooperated. Counts specifically denied making such a statement. In sum, Johnson did not deny making the inculpatory statements to the officers but testified that his inculpatory statements were a collection of falsehoods that he rendered involuntarily in response to the officers' suggestive and scare tactics. He now appeals his conviction.
 
 
 9
 Johnson first contends that, because the officers lacked probable cause to arrest him or to search the automobile he was driving, the heroin found in the automobile should have been suppressed as the fruit of an unconstitutional search and seizure. We believe, however, that the officers had probable cause both to arrest Johnson and to search the vehicle he was driving.
 
 
 10
 First, probable cause to arrest Johnson existed if " 'at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense.' " United States v. Garcia, 848 F.2d 58, 59-60 (4th Cir.), cert. denied, 487 U.S. 957 (1988) (quoting United States v. Manbeck, 744 F.2d 360, 376 (4th Cir.1984), cert. denied, 469 U.S. 1217 (1985)). Although Johnson correctly notes that "one who 'accompanies a criminal to a crime rendezvous' " is not necessarily subject to arrest, see United States v. Di Re, 332 U.S. 581, 593 (1948), Di Re and similar cases are distinguishable.
 
 
 11
 Here, based on detailed surveillance and Onyido's statement during the failed transaction that "you know I have somebody else with me," the officers knew that Johnson was accompanying Onyido in his cautious and circuitous approach to the crime rendezvous. The officers also knew that Onyido had stated earlier that he always had someone with him when he sold drugs. Most importantly, the officers had conducted a previous transaction with Onyido in which the person accompanying him in the second car served as the repository of the drugs.
 
 
 12
 In Garcia we determined that probable cause existed to arrest the companion of a man whose bag lawfully was searched and which contained enough cocaine to indicate that the man probably was a drug distributor rather than a mere user. Garcia, 848 F.2d at 60-61. Johnson seeks to distinguish Garcia on the basis that drugs were found in Garcia before the companion was arrested, while here they were not discovered until after Johnson's arrest. Even if this argument would be valid in a case such as in Garcia in which the officers had no contact with either man before their single encounter, it breaks down when viewed in context of the officers' prior dealings with Onyido in this case. Given Onyido's statements and the structure of the prior sale, the officers were prudent in believing, and had probable cause to believe, that Johnson was engaged in the distribution of drugs with Onyido.[1]
 
 
 13
 Similarly, based upon the same course of dealing, the officers were reasonable in believing that Johnson's car contained the heroin that was the object of the transaction. Because the officers had probable cause to believe that Johnson's vehicle contained contraband, a warrantless search was permissible. United States v. Ross, 456 U.S. 798, 825 (1982).[2]
 
 
 14
 Finally, Johnson's claim that his post arrest statements were secured in violation of his constitutional rights turns solely on the credibility of the witnesses. All of the officers involved described an arrest and subsequent questioning that could not have been conducted more lawfully, while Johnson presented a completely different version of what took place. After the suppression hearing, the district court found as a fact that all Miranda requirements were fully complied with and that all of Johnson's statements were voluntary. In so doing, the court noted that "[t]he issue is one of credibility. Mr. Johnson's testimony is contradicted by all three officers, and I credit the testimony of the officers and not of Mr. Johnson...." We must and do accept a district court's findings of fact concerning the circumstances surrounding a confession unless they are clearly erroneous. United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir.1987), cert. denied, 486 U.S. 1010 (1988). We cannot say from the record before us that the district court's findings of fact are clearly erroneous; indeed, they are fully supported by the evidence.
 
 
 15
 Accordingly, the judgment of the district court is
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Johnson contends that contrasting Onyido's statement with respect to the location of the heroin during the first sale that "his friend in the second car had it" with his statement during the final transaction that "it is here" rendered any belief that Johnson was the courier of the drugs unreasonable. Although we decline to engage in a discussion of the meaning of "it is here," it is sufficient to say that we have no trouble construing "it is here" to include Johnson's car across the street
 
 
 [2]
 Because we conclude that the search was proper under Ross, we do not address the district court's alternative bases for upholding the search